UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
ALEXANDER ALHOVSKY and OKSANA
GONCHARENKO,

                Plaintiffs,

             - against -

NEW YORK CITY DEPARTMENT OF PARKS
AND RECREATION, ADRIAN BENEPE,
JACK T. LINN, ALESSANDRO GIOVANNI
OLIVIERI, CAPT. MCCANTS, SGT. B.
LANGSTON, and the CITY OF NEW YORK,

               Defendants.
----------------------------------X

11 Civ. 3669 (NRB)

**MEMORANDUM AND ORDER**

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Alexander Alhovsky and Oksana Goncharenko, a married couple who were "expressive matter vendors" in Central Park, have brought this action against the City of New York, the New York City Department of Parks and Recreation, the Department's former Commissioner Adrian Benepe, Assistant Commissioner Jack Linn, General Counsel Alessandro Olivieri, and Park Enforcement Patrol Officers Bene McCants and Bruce Langston.  Of the eight separate causes of action pled in plaintiffs' initial complaint, only two remain following a November 2013 stipulation – a claim alleging the violation of the equal protection clause premised on selective enforcement of park vending rules, brought pursuant to 42 U.S.C. § 1983, and a

claim for gross negligence brought pursuant to New York state law.

Now pending before the Court is defendants' motion for summary judgment. For the reasons stated herein, this Court grants defendants' motion with respect to the claim brought pursuant to § 1983 and dismisses without prejudice the state negligence claim.

<u>BACKGROUND</u>[1]

I.   **The Parties**

Plaintiffs Alhovsky and Goncharenko are "expressive matter vendors" who paint faces and make balloon animals for children in Central Park in exchange for optional donations. Defs. R. 56.1 ¶¶ 9-10.  <u>See also</u> <u>Alhovsky v. New York City Dept. of Parks and Recreation</u>, No. 11 Civ. 3669 (NRB), Memorandum & Order, August 16, 2012 (holding that plaintiffs were "expressive matter vendors" within the meaning of Park Regulation 56 R.C.N.Y. § 1-05(b)(1)).  Between 2010 and 2012, the time period relevant to

---

[1]   The facts recited here draw upon the Second Amended Complaint ("Compl."), filed June 21, 2012; Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, filed February 24, 2014 ("Defs. Mem."), Defendants' Rule 56.1 Statement in Support of their Motion for Summary Judgment, filed February 24, 2014 ("Defs. R. 56.1"), the Declaration of Rachel K. Moston, Esq. in Support of Defendants' Motion for Summary Judgment, filed February 24, 2014 ("Moston Decl."), and the exhibits annexed thereto; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed April 7, 2014 ("Pls. Opp."); Plaintiffs' Response to Defendants' Rule 56.1 Statement, filed April 7, 2014 ("Pls. R. 56.1 Ctr. Stmt."); the Declaration of Robert K. Erlanger, Esq. in Opposition to Defendants' Motion, filed April 7, 2014 ("Erlanger Decl."), and the exhibits annexed thereto; and Plaintiffs' Reply Memorandum of Law in Further Support of their Motion for Summary Judgment, filed April 21, 2014 ("Defs. Reply Mem.").

this action, plaintiffs vended almost exclusively on Wien Walk, a pathway in Central Park running from the southeast entrance to Central Park at Fifth Avenue and 60th Street to the south gates of the Central Park Zoo.  Defs. Mem. at 2; Defs. R. 56.1 ¶ 9.

Defendant New York City Department of Parks and Recreation, acting on behalf of the City of New York, has promulgated certain rules and regulations of "expressive matter vending" – i.e., the sale or offering in exchange for donation any materials with expressive content, including newspapers, visual art, or entertainment.  Defs. R. 56.1 ¶¶ 2-5.  As relevant here, these rules limit expressive matter vending to one of two permissible options – vending from specifically designated "green spots," which are allocated on a first come, first serve basis, or, in the alternative, fully mobile vending without the use of a cart, display stand or other device.  Defs. Mem. at 2-3; Defs. R. 56.1 ¶¶ 3-7.  The park rules further prohibit vendors from storing or leaving unattended personal belongings.  Defs. R. 56.1 ¶ 8.  The individual defendants who are parties to the instant action are members or former members of the Parks Department tasked, inter alia, with enforcement of park vending rules.  Defs. Mem. at 2; Pls. Opp. at 1; Defs. R. 56.1 ¶¶ 11-21.

Plaintiffs generally vended on a mobile basis from their Wien Walk location, though they occasionally made efforts to claim a designated "green spot," as discussed infra.  On a

typical day, plaintiffs Alhovsky and Goncharenko were two of approximately five mobile vendors on Wien Walk. Dep. of Bruce Langston, Erlanger Decl. Ex. 8 at 46-50.

## II. Enforcement Actions against Plaintiffs

The principal facts underlying plaintiffs' selective enforcement claim involve certain enforcement actions undertaken by defendants against plaintiffs for violation of Park rules. Between 2010 and 2012, defendants issued plaintiff Alhovsky three Notices of Violation ("NOVs") and one related criminal summons for vending in an unlawful location, and defendants issued plaintiff Goncharenko one NOV for storing unattended property in Central Park. Defs. Mem. at 3-4; Pls. Opp. at 1-2.

More specifically, on July 30, 2010, defendant PEP Officer Langston issued Alhovsky, then vending on Wien Walk, the first NOV pertinent to this action for failure to comply with the Park's mobility rule for non-green spot vendors. Pls. Opp. at 1-2. Plaintiffs allege that Sergeant Langston acted at the direction of his supervisor, defendant McCants. Id.

The next day, July 31, 2010, Sergeant Langston issued Alhovsky an NOV for failure to remain mobile, again allegedly at the direction of Captain McCants. Id.; Defs. R. 56.1 ¶ 14. At that time, according to Alhovsky's deposition testimony, PEP officers requested that Alhovsky comply with the park's mobility regulations. Dep. of Alexander Alhovsky, Erlanger Decl. Ex. 3

4

at 29.   Shortly thereafter, Sergeant Langston issued plaintiff
Alhovsky a Criminal Court Summons for failure to comply with the
directives of an officer in violation of Park Rules.   Defs. R.
56.1 ¶ 15.   After issuing the summons, PEP Officers took
plaintiff Alhovsky into custody, transported him to the precinct
for   processing   and   fingerprinting,   and   released   him
approximately two hours later.   Erlanger Decl. Ex. 3 at 29.
However, no criminal charges were pursued, and, according to
Alhovsky, the summons was removed from the system.   Id. at 30.

According to plaintiff's own deposition testimony, the July
31, 2010 arrest came as no surprise to Alhovsky.   Sergeant
Langston had warned him the previous week "that they were going
to arrest me next time they see me doing what I do."   Id. at 26.
In response, Alhovsky decided to invite media personnel to the
Park, and apparently further decided to provoke an arrest.   At
his deposition, Alhovsky testified that after receiving the
prior day's NOV, he "decided to come out and get arrested the
next day."   Id. at 56.   To publicize his anticipated arrest in
advance, he "specifically called the media, newspapers and
magazines[;] I made sure the cameras are all set up."   Id. at
26.   After receiving defendants' initial warning that he was
vending in violation of park mobility rules, Alhovsky testified
that "[a]ll I wanted is just to see if [an arrest was] really

going to happen." Id. at 27.  According to Alhovsky, the PEP officers were "reluctant" to arrest him on July 31, 2010.  Id.

The third enforcement action against plaintiff Alhovsky occurred nearly two years later.  On June 16, 2012, Parks Commissioner Benepe, whose office overlooked Wien Walk, summoned Sergeant Langston and pointed out that Alhovsky was "always in violation at this location," and that he was "tired of this guy being in this location in violation."  Pl. Opp. at 2; Erlanger Decl. Ex. 8 at 69-71.  Thereafter, Sergeant Langston issued Alhovsky an NOV for violating park mobility rules once again. Defs. R. 56.1 ¶ 14; Moston Decl. Ex. B.

During the relevant two-year time period, plaintiff Goncharenko received only one NOV for violation of the rule prohibiting unattended property.  That ticket was issued by PEP Officer Knowles on July 27, 2012, shortly after McCants and Langston had observed an unattended hamper filled with balloons in a tree near the zoo's south gate.  Defs. R. 56.1 ¶ 18; Pls. Opp. at 2.  At the time, Goncharenko was on the opposite side of the gate.  Pls. Opp. at 2; Erlanger Decl. Ex. 8 at 73-76. Goncharenko paid the fine and did not dispute the ticket.  Tr. at 3.

That plaintiffs were ticketed for actual violations of Park Rules is not in dispute here.  Tr. at 5-6.  At oral argument, plaintiffs acknowledged that the three tickets issued to

plaintiff Alhovsky "were properly given" for violation of park mobility rules.  Tr. at 2-3.  With regard to plaintiff Goncharekno's ticket for unattended property, plaintiff conceded in argument, "Was [Goncharenko's hamper] strictly unattended?  I suppose so."  Tr. at 3.  Instead, the gravamen of plaintiffs' complaint, discussed infra, is that the enforcement action they experienced constituted unconstitutional "selective enforcement" of the Park Rules.

Although the briefing focused largely on the four NOVs and one criminal summons plaintiffs received between 2010 and 2012, at oral argument plaintiffs emphasized instead alleged harassment by PEP officers.  Tr. at 12 ("[T]here are allegations by my clients that they were singled out to be harassed every day, not just get tickets.  PEP officers standing on top of them telling them to move, move, move, move, and [the officers] are not doing it to anybody else, they are just doing it to them. . . .  Again, it is not just the tickets.  It is a day-in, day-out harassment.").  Plaintiffs testified that PEP officers shadowed them and gave them recurrent directives to remain mobile, which differed in kind and in frequency from directives given to other vendors.  Pls. Opp. at 4; Compl. ¶¶ 42, 44.  According to plaintiffs' depositions, PEP officers only permitted Goncharenko to remain in one spot for five minutes, apparently in accordance with Park Rules.  Pls. Opp. at 4.  When Alhovsky, who vended

under the name "Sasha the Clown," was observed to be stationary for a period of time, PEP officers advised him, "Hey Sasha, you are pissing off the boss.  Move.  Come on, move, Sasha."  <u>Id.</u>

Further, plaintiff Goncharenko testified that PEP officers laughed at and made fun of her accent, at least initially.  She explained that "[w]hen I just get to New York, I got a thick accent and I couldn't speak at all.  I wouldn't understand 80 percent of what they are saying."  Erlanger Decl. Ex. 4 at 44-45.  She further testified that Captain McCants and others insulted her by saying, "I am not talking to you, okay? . . . I got to talk to your husband because you don't understand."  <u>Id.</u> at 45.  Goncharenko clarified that Sergeant Langston did not take part in that conduct and was "always respect[ful]."  <u>Id.</u> When questioned about anti-Russian conduct, however, Alhovsky testified that PEP officers, including Captain McCants, Sergeant Langston and others, "never" used racial epithets or slurs. Erlanger Decl. Ex. 3 at 70-71.  Indeed, plaintiffs have conceded that defendants "like [Alhovsky] personally" and harbor no "personal animus" against him.  Tr. at 13 ("As to why they are singling [Alhovsky] out, apparently they like him personally.  I did the depositions of Langston and McCants, and nobody seemed to have any personal animus against them.").

**III. Comparators and Other Enforcement Actions**

In support of their selective enforcement claim, plaintiffs allege that they were treated from similarly situated individuals.  See infra Section V, for further discussion of the applicable legal standards.  Hence, defendants produced during discovery all NOVs to "expressive matter vendors" for unlawful vending that occurred in a non-designated "green spot," issued in the approximately two-year time period between July 20, 2010 and September 20, 2012.  Defs. Mem. at 8.  Twenty-three such NOVs were issued during that period to non-green spot expressive matter vendors.  Id.  Of those twenty-three tickets, three were issued to plaintiff Alhovsky and one was issued to plaintiff Goncharenko, as described supra.  Id.  Ten of the twenty-three NOVs, including the four received by plaintiffs, covered conduct on Wien Walk, where plaintiffs almost exclusively vend.  Id. Plaintiffs do not dispute these numbers, although they choose to frame the numbers within narrower categories – noting, for example, that of eight NOVs issued on Wien Walk for non-mobile vending violations specifically, Alhovsky was issued three. Pls. Opp. at 12.

In an attempt to carry their burden, plaintiffs identified in their responses to interrogatories five similarly situated individuals, sometimes referred to as "comparators," whom they allege were treated differently than plaintiffs:  (1) Ronnie

Weinstein the puppeteer, (2) Abraham the Juggler, (3) David Rice the Juggler, (4) Josh the Juggler, and (5) Colin Jaffee, a balloon-shaper.  Defs. Mem. at 9; Pls. Amended Response to First Set of Interrogatories, Moston Decl. Ex. D.  We briefly describe here the facts elicited in discovery about these identified comparators.

The first three identified comparators – Ronnie Weinstein the Puppeteer, Abraham the Juggler, and David Rice the Juggler – are similar to one another, and different from plaintiffs, in a number of respects.  For instance, unlike plaintiffs, all three vended as pure entertainers and did not distribute "expressive matter." Defs. Mem. at 15, n.10; Erlanger Decl. Ex. 3 at 36-37, 41-43, 46.  All three also vended either primary or exclusively on Wallach Walk, a location north of the zoo and separated by the zoo itself from plaintiffs' vending location on Wien Walk.[2] Erlanger Decl. Ex. 3 at 38, 42, 46.  As to all three, plaintiff Alhovsky testified that he believed they had never received a notice of violation, but did not know if they had been arrested or issued a criminal court summons in connection with their vending.   Id. at 39, 43, 47.   Plaintiff identified the

---

[2]     The first comparator, Ronnie Weinstein the Puppeteer, whose nationality Alhovsky identified as "Jewish," apparently vended primary on Wallach Walk, north of the zoo, but also vended occasionally from a designated green spot on Wien Walk.  Defs. Mem. at 10; Erlanger Decl. Ex. 3 at 37-38 ("Q: Where specifically on Wien Walk [does Ronnie vend]? A: "On the designated green spot where it's available . . .  Most part, 90 percent I see him on Wallach.").  The latter two, Abraham the Juggler and David Rice the Juggler, vended exclusively on Wallach Walk.  Erlanger Decl. Ex. 3 at 42, 46.

nationality of the first two comparators, Ronnie Weinstein the Puppeteer and Abraham the Juggler, as "Jewish," but did not testify as to the nationality of David Rice the Juggler.   Id. at 41, 43-44.

With regard to all of the first three comparators, Alhovsky testified about situations in which he received tickets for failure to remain mobile, while his equally non-mobile comparators escaped enforcement despite committing the same infraction at the same location on Wallach Walk.   See, e.g., Erlanger Decl. Ex. 3 at 40 ("Q: Has there ever been a situation when you are vending in the same location and enforcement action had been taken against you but not Ron[nie] Weinstein the Puppeteer]?   A: Yes . . .   Any of the tickets I was given on Wallach Walk on the north side has him in the background.   I was given a ticket, he was left alone."); see also id. at 44, 47. In all three cases, however, Alhovsky's testimony is belied by the documentary record, which establishes that all of Alhovsky's tickets were issued on Wien Walk, not Wallach Walk.

The fourth identified comparator, Josh the Juggler, vended as an entertainer basing himself on Wien Walk, which was also plaintiffs' primary vending location.   Id. at 50.   Alhovsky identified Josh's nationality as "Asian," and more specifically "Korean."   Id. at 52.   When asked about enforcement action against Josh the Juggler, Alhovsky recalled the existence of

11

"one incident but I don't know when it happened;" he also had limited information as to where the enforcement action occurred and whether it carried criminal consequences.  Id. at 51. Plaintiff Goncharenko testified that she was not familiar with Josh the Juggler.  Erlanger Decl. Ex. 4 at 33.

The fifth identified comparator, Colin Jaffee, is the closest comparator who was situated most similarly to plaintiffs.  Like plaintiffs, Colin Jaffee was a balloon shaper and thus an "expressive matter" vendor.  Erlanger Decl. Ex. 3 at 52-54.  Jaffee also vended on Wien Walk, and particularly "in the same part of Wien Walk" as did plaintiffs.  Id. at 52.  In addition to vending the same wares at the same location as plaintiffs, Jaffee also shared another similar condition – he too had been the subject of enforcement action and had received an NOV during the relevant time period from Park officers.  Id. at 53.

Although not identified in their interrogatory response, plaintiffs mentioned in their opposition papers two additional comparators, about whom less information is available.  Pls. Opp. at 3-4.  Sean, a fellow balloon-shaper who vended on Wien Walk, apparently did not receive NOVs, perhaps because, unlike Alhovsky, he complied with PEP officer directives given to him. Erlanger Decl. Ex. 3 at 74 ("Q: Did Sean ever have enforcement action taken against him?  A:  No, other than told to leave and

he would leave."). Jason Ruby and his wife Stacey, also face-painters and balloon-shapers, based themselves on Wallach Walk. Erlanger Decl. Ex. 4 at 26-27. Although plaintiffs allege differential treatment from Ruby and his wife, Alhovsky testified that Ruby and his wife were issued a ticket by PEP officers for a vending violation. Erlanger Decl. Ex. 3 at 69.

## IV. Green Spot System

The remaining facts relevant to the instant motion involve plaintiffs' state law negligence claim. As discussed <u>supra</u>, in summer 2010 the Park promulgated a regulatory regime, whereby expressive matter vendors could lay claim to specifically designated "green spots," within which vendors were permitted to vend on a non-mobile basis, with the use of a cart, display stand, or other device.[3] Defs. R. 56.1 ¶ 6; Rules of the City of New York, Title 56, §1-05(b)(2)-(3). Pursuant to Park rules, the green spots were allocated daily to vendors on a first-come, first-served basis, beginning when the Park opened at 6 a.m. Defs. R. 56.1 ¶ 7; Pls. R. 56.1 Ctr. Stmt. ¶ 104. PEP Officers were typically present to supervise the appropriation of green spots for the day. Pls. R. 56.1 Ctr. Stmt. ¶ 105-107. For the first few days after the green spot regime went into effect in summer 2010, Park personnel observed vendors rushing to claim

---

[3]     As discussed extensively <u>supra</u>, expressive matter vendors are permitted to vend outside the green spots only on a mobile basis – <u>i.e.</u>, without the use of a cart, display stand, or other device. Defs. R. 56.1 ¶ 6.

spots, but that haste subsided within the week.  Dep. of Michael Dockett, Erlanger Decl. Ex. 9 at 16, 19.

Plaintiffs' negligence claim stems from two injuries sustained by plaintiff Alhovsky as he sought to claim a green spot in 2010, shortly after the enforcement of the green spot regime began.  Compl. ¶¶ 46-47, 91-95; Erlanger Decl. Ex. 3 at 75-87.  On the first occasion, August 1, 2010, Alhovsky fell and injured his hamstring.  Erlanger Decl. Ex. 3 at 75-82. Approximately one week later, on August 7, 2010, Alhovsky fell and fractured his elbow, for which he sought hospital treatment including X-rays, an MRI, a sling and pain medication.  Id. at 83-87.  Alhovsky testified that on both occasions, he did not trip and was not pushed to the ground, but rather fell due to a weakness in his leg.  Id. at 79-80, 83-87.

In the complaint, plaintiffs allege that, by instituting the first-come, first-served allocation regime, which foreseeably gave rise to a "frenzied, mob rush for a green spot," defendants committed a breach of their duty of care, causing Alhovsky's injuries.  Compl. ¶¶ 91-95.

## DISCUSSION

### V.  Standard of Review

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P.

56(a).  In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted).  "In assessing the record to determine whether there is [such] a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'"  F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  Id. (citing Anderson, 477 U.S. at 249).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation."

Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).

**VI.  Equal Protection Claim**

The Equal Protection Clause requires that the government treat all similarly situated people alike.  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  In their sole remaining federal claim, plaintiffs allege that defendants violated this fundamental precept by pursuing selective enforcement of Park rules against plaintiffs.

**A.  Selective Enforcement**

To prevail on a standard claim of selective enforcement, plaintiffs must establish two elements: "(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  Harlen Assocs. v. Incorporated Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (internal quotation marks and citations omitted). Historically, these two factors were known, respectively, as the "unequal hand" and "evil eye" elements, and where both were present a law "fair on its face and impartial in appearance" could still be enforced in such a manner as to constitute the

denial of constitutional rights.   Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886).

Conspicuously absent from the record before us is meaningful evidence of the second requisite prong – that plaintiffs' Russian national origin impermissibly motivated the alleged differential treatment.   See Compl. ¶ 108.   The only evidence suggesting that defendants were attentive to plaintiffs' national origin is Goncharenko's testimony that, shortly after her arrival in New York, PEP officers laughed at her accent and her difficulty understanding English and told her that they preferred to speak to her husband Alhovsky, himself of Russian origin.   Erlanger Decl. Ex. 4 at 44-45.

By contrast, the weight of the evidence, including plaintiffs' own testimony, instead indicates that discriminatory animus did not motivate defendants' enforcement.   Alhovsky testified that PEP officers, including the one who mocked Goncharenko's accent, "never" used racial epithets or slurs. Erlanger Decl. Ex. 3 at 70-71.   Goncharenko further testified that Sergeant Langston, the PEP officer with whom plaintiffs apparently most frequently interacted and who issued plaintiffs all four of the NOVs they received in the relevant time period, was "always respect[ful]."   Erlanger Decl. Ex. 4 at 45. Moreover, according to plaintiffs, defendant Jack Linn, then Assistant Commissioner, visited plaintiffs in the Park "and he

actually told us that we are doing a good job." Id. at 46. Indeed, at oral argument, plaintiffs conceded the point entirely, indicating that defendants held no personal animus against plaintiffs. Tr. at 13.

In light of these facts, plaintiffs acknowledged at oral argument that "the evidence is not particularly strong that [defendants] discriminated against [plaintiffs] because they were Russian." Tr. at 12. Because plaintiffs admittedly cannot show that the alleged differential treatment was based in impermissible considerations of their national origin, they fail to establish a requisite element of a standard selective enforcement action and accordingly cannot survive summary judgment on the claim itself.

### B.   Class of One

In recognition of this weakness, plaintiffs' briefing and argument focused primarily on a second form of selective enforcement action – the "class of one" claim. Pursuant to this doctrine, a plaintiff claiming violation of his equal protection rights need only allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Plaintiffs may bring a "class of one" action even if they do not claim membership in a class or differential treatment based on race,

religion, national origin or the like, so long as they can show "invidious discrimination" by government officials, Harlen, 273 F.3d at 499, which was "intentional and arbitrary." Olech, 528 U.S. at 564.

Though plaintiffs in a "class of one" action need not show class membership and discriminatory animus on the basis thereof, such plaintiffs must nonetheless meet a high standard when establishing differential treatment from others similarly situated. Second Circuit precedent instructs that "[c]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." Ruston v. Town Bd. for Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010) (quoting Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir.2006)). "Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." Id. at 59-60 (citation omitted). Though the question of similar situation is a factual inquiry that typically should be submitted to the jury, in cases where no reasonable jury could find that

plaintiffs have made the requisite showing of extremely high degree of similarity, summary judgment is appropriate.  Harlen, 273 F.3d at 499 n.2.

Plaintiffs here have neither sufficiently established the required "high degree of similarity" between themselves and comparators nor have they shown reliable evidence of treatment so differential that no rational basis or legitimate government policy could explain the disparity.  As an initial matter, it must be noted that plaintiffs' testimony comprises the vast majority of the evidence regarding similar situation, with limited or no corroboration from other witnesses or documents regarding the names, facts, or even existence of the comparators.

Nonetheless, even crediting where possible plaintiffs' uncorroborated testimony and drawing all permissible inferences in their favor, as we must, this Court cannot satisfy itself that plaintiffs have sufficiently shown the required similar situation to comparators.  As exhaustively detailed supra, the record indicates genuine differences between plaintiffs, who were expressive matter vendors vending on Wien Walk, a heavily trafficked path to the Central Park Zoo, and a number of the named comparators, who were pure entertainers vending on Wallach

Walk,[4] which was "not even close to where the zoo area is."
Langston Dep., Erlanger Decl. Ex. 8 at 50.

That difference in location gives rise to an explanation
for possible differential treatment that is far more plausible
than the invidious or baseless account argued by plaintiffs. As
Alhovsky himself testified, plaintiffs vended directly in front
of Commissioner Benepe's office.   Erlanger Decl. Ex. 3 at 74
("Q:  Do you know if he can see you out his window?  A:  He's
got like the best view of me out there.  That's where his window
is directed.  He doesn't see much other than me.").   Per
defendant Langston's testimony, Benepe commented that Alhovsky
was "always in violation at this location," and that he was
"tired of this guy being in this location in violation."  Pl.
Opp. at 2; Erlanger Decl. Ex. 8 at 70-71.  Plaintiffs do not
dispute that they committed the violations for which they were
ticketed.  Tr. at 3, 5-6.  Hence, to the extent that defendant
Benepe was in a position to continually observe plaintiffs in
violation of Park rules, defendants' actions to enforce the
rules are in accordance with their obligations as Parks
Department officials, rather than evidence of "intentional and
arbitrary" discrimination.  Olech, 528 U.S. at 564.  To be sure,
vendors who chose to vend on Wallach Walk may have been beyond

---

[4]     These three comparators were Ronnie Weinstein the Puppeteer, Abraham
the Juggler, and David Rice the Juggler.  See supra, Section III.  Balloon-
shaper and face-painter Jason also vended from Wallach Walk.

the scope of defendant Benepe's personal observation and hence may have received less enforcement attention. That state of affairs, however, does not persuade us that "Benepe's conduct toward Alhovsky and Goncharenko has been invidious and in bad faith" or otherwise motivated by "personal animus," as plaintiffs contend, particularly in the absence of any other evidence to that effect. Compl. ¶ 110-11. Indeed, plaintiffs themselves have conceded that no personal animus existed. Tr. at 13. If plaintiffs felt "singled out" compared to those who vended on Wallach Walk, they were certainly welcome to relocate away from the immediate environs of Parks Department offices. Comp. ¶¶ 108-110.

The type of vending represents another difference between plaintiffs and named comparators. As balloon-shapers and face-painters, plaintiffs constituted "expressive matter vendors," who provided their art to customers in exchange for donations. By contrast, some of the named comparators, including four of the five named in response to interrogatories, were pure "entertainers" – i.e., jugglers and puppeteers who did not sell their wares. From at least March 2012 through the end of the relevant time period, the Parks Department stopped enforcing the vending rules against entertainers, in an effort to comply with their reading of a New York State court decision. Defs. Mem. at 15, n.10. While this period represents only approximately six

months of a two year relevant time frame, it nonetheless carries at least some weight in explaining differential enforcement, to the extent it existed.

The record reflects yet further possible differences between plaintiffs and alleged comparators in attitude and interaction style. For instance, comparator Sean, a balloon-shaper on Wien Walk about whom limited information is available, promptly complied with defendants' directives to remain mobile, thereby escaping further enforcement action. Erlanger Decl. Ex. 3 at 74 ("Q: Did Sean ever have enforcement action taken against him?  A:  No, other than told to leave and he would leave."). By contrast, according to his own testimony, Alhovsky ignored initial warnings and appeared to welcome the opportunity to be arrested, even going so far as to publicize his anticipated arrest by calling news media beforehand.  See supra Section II.

Taken together, this evidence makes clear that no genuine issue of material fact exists as to whether plaintiffs can establish the required "extremely high degree of similarity" between themselves and the comparators.  Ruston, 610 F.3d at 59. They cannot.

Further, even if plaintiffs had been able to establish the similar situation element, their claim would founder on the requirement to show differential treatment.  Indeed, plaintiffs' testimony is rife with contradictions as to the differential

enforcement itself. Alhovsky's testimony that PEP Officers targeted him on Wallach Walk for mobility violations, while ignoring the same behavior in others, is directly refuted by the documentary record establishing that Alhovsky was not issued any tickets on Wallach Walk. See supra, Section III. With regard to those tickets plaintiffs actually received at their Wien Walk vending location, plaintiffs have not shown that this treatment was, in fact, differential. Rather, Alhovsky testified that two named comparators who also vended on Wien Walk – Josh the Juggler and Colin Jaffee the Balloon-shaper – were also both subject to enforcement action, and thus experienced similar, not differential, treatment to plaintiffs. Plaintiffs' failure to establish differential treatment in their deposition testimony is only compounded by the documentary data, which indicates that, out of twenty-three NOVs issued during a two-year time period to mobile vendors, ten of which were issued on Wien Walk, plaintiffs received only four such tickets. Given that plaintiffs were two of only a handful of mobile vendors on Wien Walk, the data does not suggest that they received a highly disproportionate share of tickets.

Having failed to establish the elements required for either a standard selective enforcement claim or a "class of one" action, plaintiffs' evidence is insufficient to survive summary

judgment.   Accordingly, defendants' motion for summary judgment as to the equal protection claim is granted.

## VII. Negligence Claim

Plaintiffs' remaining claim is a state law claim for negligence, arising out injuries Alhovsky sustained while attempting to claim a vending location pursuant to the Park's "green spot" regime.  Having granted summary judgment and dismissed the claim for which there exists federal-question jurisdiction, it is within this Court's discretion to decide whether to exercise supplemental jurisdiction over plaintiff's remaining state claim.  *Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.,* 464 F.3d 255, 262-63 (2d Cir. 2006); see also *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."). We exercise this discretion here and decline supplemental jurisdiction over plaintiffs' negligence claim, which is hereby dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted insofar as this Court dismisses the only federal claim.   This Memorandum and Order resolves Docket No. 35, and the Clerk of Court is respectfully requested to close this case.

Dated:   New York, New York
         August  /9,  2014


_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorney for Plaintiffs**

Robert K. Erlanger, Esq.
Erlanger Law Firm PLLC
122 East 42nd Street, Suite 519
New York, NY 10168

**Attorneys for Defendants**

Rachel K. Moston, Esq.
Sheryl R. Neufeld, Esq.
Melanie V. Sadok, Esq.
Office of the Corporation Counsel
City of New York
Law Department
100 Church Street
New York, NY 10007